IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ROBERT WILLIAM AVERY                                                PLAINTIFF

        v.                          Civil No. 04-5205

SHERIFF KEITH FERGUSON;
CAPTAIN HUNTER PETRAY;
SGT. JOHNSON; LT. GENE
HENDRICKS; SGT. CLIFFORD;
SGT. DAUGHERTY; DEPUTY HUBBS;
DEPUTY EFRAM; DEPUTY RAHN;
DEPUTY TOMLIN; and DEPUTY ADAMS                         DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Robert William Avery, a former inmate of the Benton County Detention Center, brings

this pro se civil rights action pursuant to 42 U.S.C. § 1983.   Avery contends his constitutional

rights were violated in the following ways while he was an inmate of the Benton County

Detention Center:  (1) the defendants failed to protect him from attack by fellow inmates; (2) the

defendants retaliated against him for filing this civil rights lawsuit; and (3) the defendants

violated his rights by placing him on display during public tours of the facility.   Defendants

motion for summary judgment addresses only the first claim.

On April 29, 2005, defendants filed a motion for summary judgment (Doc. 36).  By order

entered on May 23, 2005 (Doc. 39), Avery was directed to complete, sign, and return an attached

questionnaire that would serve as his response to the summary judgment motion.  On June 10,

2005, plaintiff's response to the court's questionnaire (Doc.40) and a supplemental response

-1-

(Doc. 41) was filed. The summary judgment motion is currently before the undersigned for issuance of this report and recommendation.

## I. BACKGROUND

Avery was booked into the Benton County Detention Center (BCDC) on April 7, 2004, on a violation of the hot check law and for a probation revocation. *Plaintiff's Response* (Doc. 40)(hereinafter *Resp.*) at ¶ 1. He was found to have violated his parole on July 19, 2004. *Id.* at ¶ 91.

Later, Avery was charged with conspiracy to manufacture methamphetamine. *Resp.* at ¶ 2. Avery remained incarcerated at the BCDC until August 23, 2004. *Id.* at ¶ 92.

On May 1, 2004, Avery was involved in a fight with another inmate, Anthony Smith, in D-130. *Resp.* at ¶ 3. Prior to May 1, 2004, there had been no problems between Avery and Smith. *Id.* at ¶ 4. After the fight on May 1, 2004, Deputy Larkin handcuffed both Avery and Smith and removed both from the area. *Id.* at ¶ 5. As a result of the fight, Avery had some bruises and swelling. *Id.* at ¶ 9.

Because Avery was seen holding Smith in a headlock and admitted doing this, he was locked down in E-102. *Resp.* at ¶ 6. He was given a disciplinary and found guilty of fighting. *Id.* at ¶ 7. He was given thirty days look-down and loss of privileges. *Id.* He appealed the decision and the decision was affirmed. *Id.* at ¶ 8.

On May 20, 2004, Avery states he was questioned by Lt. Hendricks, Sgt. Clifford, and Sgt. Daugherty about Smith. *Resp.* at ¶ 17. Avery asserts he provided them information about Smith and this information lead to Smith's re-arrest. *Id.*

-2-

Despite this, Avery states Smith was put in the same housing unit. *Resp.* at ¶ 17. Avery maintains that the defendants had a duty to protect him especially after he gave them information that helped them re-arrest a man who was facing a murder charge. *Id.* Avery indicates Smith had been released by jail officials by mistake and the mistake had gone undetected until Avery came forward. *Id.* at ¶ 17 & ¶ 18.

Specifically, Avery indicates Smith, through defendants' error was allowed to bond out of jail on a $2500 bond. *Supplemental Response* (hereinafter *Supp. Resp.* (Doc. 41)) at p. 1. According to Avery, Smith was going to gather the components to manufacture methamphetamine so that he could come up with the means to flee prosecution. *Id.*

On May 20th when he was being escorted to the captain's office to be questioned about Smith, Avery states he was seen by trustee Richard Brooks. *Resp.* at ¶ 22. Avery maintains defendants should have prevented this. *Id.* Avery indictes the fact that he was in the administration area giving information to the defendants became common knowledge among the inmates at the BCDC. *Supp. Resp.* at p. 2.

After he was questioned, Avery indicates he was returned to D-130. *Resp.* at ¶ 19. Avery maintains he should not have been returned to D-130. *Id.* at ¶ 22.

According to Avery, Smith was re-arrested late in the evening on May 20th or prior to 6:30 a.m. on May 21st. *Resp.* at ¶ 21. On May 21, 2004, Deputy McPherson saw Avery and inmate Christopher Jackson face to face. *Resp.* at ¶ 10. Avery turned away from Jackson and went into the public restroom. *Id.* Deputy McPherson called on the intercom and asked Avery to come to pod control to talk. *Id.* at ¶ 11. Avery told McPherson that he had been bitten by

-3-

someone.  *Id.* at ¶ 12.  However, Avery stated he did not know who bit him.  *Id.*  McPherson then called Sgt. Ponge to come to D-pod.  *Id.*

Avery was seen by the jail nurse.  *Resp.* at ¶ 13.  Avery was given a tetanus injection and an ice pack.  *Id.*  The nurse noted the wound was non-draining.  *Id.*

Avery states he identified the inmate who bit him as Joseph Walters that same day.  *Resp.* at ¶ 14 & ¶ 15.  Prior to May 21st, Avery had not had any problems with Walters.  *Resp.* at ¶ 17.

According to defendants, it was on May 26th that Avery voluntarily gave information to the defendants about the activities of Smith to assist in arresting him.  *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 2 at page 7.  Defendants also maintain Avery was placed in a different pod because there was no other place to house him.  *Id.*  Defendants state Avery was not disciplined.  *Id.*  Avery maintains he gave defendants information about Smith on May 20th not on May 26th.  *Id.* at ¶ 20(B).

Avery was asked to explain why he believed Walters biting him on May 21st had anything to do with Smith or the information Avery had provided about Smith.  Avery responded:  "Because before I was attacked Smith[,] Wolfe[,] & Walters all said Brooks told them about me being escorted to the Captain[']s office.  When I got nervous I was then called a snitch & then attacked."  *Resp.* at ¶ 23.

Avery does not maintain that one or more of the defendants intentionally started the rumor.  *Resp.* at ¶ 24.  However, he believes they should have known he was in danger of being bitten by Walters or attacked by some other inmate because:  (1) he was seen by Brooks being

-4-

escorted into the captain's office for questioning; and (2) after Smith was re-arrested due to the information Avery provided, Smith was put into the same housing unit Avery was in. *Id.*

On May 26, 2004, the jail nurse made a note that Avery wanted a HIV test done on the inmate who bit him. *Id.* at ¶ 16. She indicated blood was drawn for the test the day before. *Id.* Avery, however, states he does not believe that the test was ever done. *Id.* Avery states he submitted numerous grievances asking for an HIV test to be done and none of them were answered confirming that a test had been done. *Id.* Avery also indicates no blood was ever drawn from him. *Id.* Avery states he would call Joseph Walters to testify regarding this issue.

On June 14th Avery submitted a grievance in which he stated he gave Lt. Hendricks, Sgt. Clifford, and Sgt. Daugherty information about Smith's release on May 20th. *Resp.* at ¶ 20(A). Avery refers to being in protective custody and states he does not believe that is the answer and to asks for some other solution before he is attacked again. *Id.*

Avery believes he was in danger while he was in protective custody. *Resp.* at ¶ 26. He believed this because he was still put into situations where he was in Smith's reach due to the staffs' deliberate indifference. *Id.*

Avery was served with a subpoena to testify against Smith on June 16, 2004. *Resp.* at ¶ 42. Lt. Hendricks served the subpoena. *Id.* at ¶ 43.

In a June 21st grievance, Avery indicated that one of the trustees caused Walters to bite him. *Resp.* at ¶ 27. Avery believed this because Brooks was in the jail administration area when Avery was taken up front to be questioned about Smith. *Id.* According to Avery, Brooks went and told Wolfe, Walters and Smith about Avery being in the captain's office. *Id.* Avery also

AO72A
(Rev. 8/82)

stated in the June 21st grievance that he needed to know if Walters had been tested and what the results of the tests were. *Id.* at ¶ 28.

On June 23, 2004, Avery submitted a grievance stating he had been told a HIV and Hepatitis test was done on Walters and Avery needed to know the results. *Resp.* at ¶ 29. In response, Captain Petray told Avery to talk to the medical staff.

On June 24th, Avery submitted a grievance. *Resp.* at ¶ 30. He stated he had been put in harms way by jail staff. *Id.* Avery stated he had been subpoenaed against Smith but jail staff had put him in the same pod with Avery. *Id.* Avery indicates both were in pod E-104 on June 24th and June 25th. *Supp. Resp.* at p. 2. Avery stated in his grievance that he believed this was allowed to occur in retaliation for his having filed a civil rights lawsuit. *Resp.* at ¶ 30.

Captain Petray responded on June 25th that Avery was not in the same pod with Smith and they were not housed together. *Resp.* at ¶ 31. Petray stated Avery was in E-104 and that Smith was not in E-104. *Id.* Petray also stated there was no retaliation. *Id.* Avery, however, contends both he and Smith had been housed in E-104. *Resp.* at ¶ 32 & ¶ 33.

Avery maintains Smith was moved to a different location on June 25th by Deputy Powell. *Id.* at ¶ 45. According to Avery, Powell remarked: "What the h— were they thinking putting him in here with you."

On June 25th and June 29th, Avery submitted medical requests stating he had been told Walters would be tested for HIV and Hepatitis. *Resp.* at ¶ 35. He stated he needed to know the results of the test and have proof of their authenticity. *Id.* On June 29, 2004, Avery was seen

-6-

in the clinic by Dr. Mullins and advised that he would double check and make sure the tests had been done. *Id.* at ¶ 36.

On July 5, 2004, Avery submitted a grievance dealing with an incident that occurred on June 24th. *Resp.* at ¶ 36. He stated that Smith was moved into E-104 by Deputy Tomlin while Lt. Hendricks was present. *Id.* Avery stated he was in E-104 on June 25th and Smith's door was opened and he was allowed into the day-room with Avery. *Id.*

Avery indicates there were numerous inmates in the day-room. *Resp.* at ¶ 38. No detention center personnel were in the day-room. *Id.* at ¶ 39. Avery states the day-room was monitored through a window. *Id.* According to Avery, a detention deputy sits behind a control desk and watches numerous pods at once. *Id.*

While they were in the day-room, Smith threatened Avery. *Resp.* at ¶ 40. Specifically, Avery maintains Smith said: "I can't believe you signed a statement, I should kill you. You're the reason I'm in here." *Id.* Avery contends this statement caused him mental anguish and put him in fear of being killed by Smith. *Id.* at ¶ 41.

Captain Petray responded to Avery's July 5th grievance on July 6th. *Resp.* at ¶ 44. Petray stated Smith had been moved to a different location. *Id.*

On July 20, 2004, Avery submitted a grievance. *Resp.* at ¶ 46. He stated that on July 12, 2004, he was called out for a shave before he was to testify against Smith. *Id.* Avery states Smith was pulled out at the same time. *Id.*

Avery indicates they were both down the hall from the control desk. *Resp.* at ¶ 47. Two officers were presented. *Id.* According to Avery, Smith stated that if Avery testified Smith

-7-

would kill him. *Id.* Avery states he informed the officers that he was not to be in the same area

as Smith. *Id.* Their response was to tell Avery to lock back down. *Id.* Avery asserts he suffered

mental anguish as a result of the threat made by Smith. *Id.* Avery points out that Smith was

awaiting trial for murder. *Id.*

None of the named defendants were present on July 12th when Avery and Smith were

both called out at the same time. *Resp.* at ¶ 48. Avery maintains the defendants, as supervisors,

should have informed the staff that Avery and Smith were not to be in the same area together.

*Id.*

On July 27, 2004, Avery was involved in a fight with inmate Yoecer Paz in D-153.

*Resp.* at ¶ 49. Deputy Rahn and Deputy Hubbs separated Avery and Paz. *Id.* at ¶ 50. Rahn

escorted Paz from the pod. *Id.* at ¶ 51.

When Hubbs escorted Avery from the pod inmate Smith starting yelling at Avery. *Resp.*

at ¶ 52. Avery was yelling back. *Id.* at ¶ 53. Rahn told both inmates to shut up and both

continued to yell. *Id.* at ¶ 54. Rahn then yelled shut up and everyone was silent. *Id.*

Avery told Rahn that Paz sucker punched him and repeatedly hit him. *Resp.* at ¶ 55. Sgt.

Johnson arrived and asked Avery what happened. *Id.* at ¶ 56. Avery and Smith began to yell at

each other again. *Id.*

Deputy Efram instructed Smith to turn around and face the wall on his knees with his legs

crossed. *Resp.* at ¶ 57. Avery told Sgt. Johnson Paz had sucker punched him, repeatedly hit him,

and also made a comment about Smith sending Paz to do a hit on him. *Id.* at ¶ 58.

-8-

Avery and Smith began to yell at each other again. *Resp.* at ¶ 59. Avery was sent back to his pod. *Id.* at ¶ 60. Smith was also sent to his pod and Sgt. Johnson left D-pod to go talk to Paz. *Id.* at ¶ 61.

Sgt. Johnson later called D-Pod and told Rahn that Avery was to be taken to E-pod and locked down for fighting. *Id.* at ¶ 62. While Avery was in the hallway getting ready to go to E-pod, he asked why he was getting locked down. *Id.* at ¶ 63. Avery was informed that both he and Paz were getting locked down because the deputies did not know who started the fight. *Id.* at ¶ 64.

Avery asked to see Sgt. Johnson and were told that Johnson would talk to Avery in E-pod. *Resp.* at ¶ 65. Avery stated that the deputies would have to fight him first before he would go down to E-pod if he didn't get to talk to Johnson and Avery threw his belongings on the floor. *Id.* at ¶ 66. Rahn and Efram then left D-pod control and came into the hallway where Avery was standing. *Id.* at ¶ 67. Avery changed his attitude about going to E-pod. *Id.*

Sgt. Johnson was called and told Avery wanted to talk to him. *Resp.* at ¶ 68. Johnson stated he would talk to Avery in a little while in E-pod. *Id.* Hubbs and Efram escorted Avery to E-pod. *Id.* at ¶ 69.

When Avery talked to Sgt. Johnson he stated he believed he was in danger. *Resp.* at ¶ 70. Avery also submitted a request that day asking to be put in protective custody. *Id.* at ¶ 71. He stated he was being labeled a snitch and this is why Paz had attacked him. *Id.*

As a result of the fight with Paz, Avery states he suffered a busted lip, swollen and bleeding gums, numerous bruises, extreme pain, and loose teeth. *Resp.* at ¶ 73. He sought

-9-

medical treatment on July 27th and was seen the following day. *Id.* Avery contends he was in pain for over a week. *Id.*

Prior to the incident on July 27, 2004, Avery had experienced no problems with Paz. *Resp.* at ¶ 74. He had not reported to any of the defendants that he believed he was in danger from Paz. *Id.* at ¶ 75. However, Avery asserts that Paz had been involved in two previous fights with other inmates. *Supp. Resp.* at p. 3.

On July 27, 2004, Sgt. Johnson approved Avery's request to be placed in administrative segregation. *Defts' Ex.* 2 at p. 12. Avery, however, states he was not moved to administrative segregation until July 28, 2004. *Resp.* at ¶ 72. When he was moved, Avery states he remained there only part of the day before he was returned to the general population. *Id.*

Avery submitted another grievance on July 27th in which he stated Deputies Hubb, Efram, Rahn, and Adams allowed Paz into D-153 and he attacked Avery. *Resp.* at ¶ 76. Captain Petray responded on July 28th by informing Avery that Paz was being charged as a result of the incident. *Id.* at ¶ 77.

On July 27th, Avery submitted a third grievance in which he asked why he was being punished when he was the one who was attacked. *Resp.* at ¶ 78. Captain Petray responded on July 28th. *Id.* at ¶ 79. He stated Avery was not being locked down and Paz was being charged as a result of the incident. *Id.*

On July 28th, Avery submitted another grievance stating he had been attacked by an inmate from E-102 while Hubbs, Efram, Rahn, and Adams were on duty. *Resp.* at ¶ 80. On July

-10-

28th, Avery submitted a request stating that he wanted to file charges for last nights attack on him by Paz. *Id.* at ¶ 81. In response, Avery was told charges had already been filed. *Id.* at ¶ 82.

On July 28th, Avery submitted another document in which he complained that Paz was allowed to travel from E-102 to D-153 "in order to" attack him. *Resp.* at ¶ 83. On July 29th, Avery filed another grievance in which he stated jail staff allowed Paz to travel from E-102 to D-153 in order to attack him. *Id.* at ¶ 84.

According to defendants, on August 3, 2004, Avery submitted a grievance. *Defts' Ex.* 3 at p. 59. It stated Avery was housed next to Smith and was afraid that when he was in the hall Smith might jump on Avery again and beat him up. *Id.* It stated Avery felt his life was in danger. *Id.* Avery requested transfer to protective custody. *Id.* Avery also stated he was having racial problems within his pod. *Id.*

Avery, however, states this grievance was written by someone other than himself. *Resp.* at ¶ 85. In response, Captain Petray stated Avery was in a separate cell block than Smith. *Id.* at ¶ 86. He also stated he would have the sergeant come and talk to Avery. *Id.*

Avery was in a different cell block than Smith. *Resp.* at ¶ 87. However, he still believed he was in danger because D-153 and D-154 were right next to one another and the defendants allowed both pods to go out for church, etc., at the same time. *Id.*

On August 3, 2004, Avery submitted a grievance about the behavior of Buth. *Resp.* at ¶ 88. Avery stated Buth had been laughing about the incident between Avery and Paz; Buth refused to allow Avery to get his Bible and letters off the table when he returned from church; Buth had said that none of the deputies had been punished for allowing Paz to attack Avery. *Id.*

-11-

Avery stated he believed Buth was singling Avery out and retaliating against him. *Id.* Avery also stated he believed Buth had intentionally let Avery and Smith out together. *Id.*

In response, Captain Petray stated that he would look into the matter for Avery. *Resp. at ¶ 89.* Petray stated Paz was being charged for attacking Avery and the deputies in the pod and had been disciplined. *Id.* Petray also stated they were there to do their jobs and not to make negative comments towards inmates. *Id.*

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

-12-

## III. DISCUSSION

Defendants have moved for summary judgment on the failure to protect claim. Defendants contend there was no reason to suspect that Avery would be attacked by fellow inmates. They argue Avery's claim is premised essentially on three separate incidents: First, the fight with Smith on May 1, 2004; Second, when Avery was bitten by Walters on May 21, 2004; and Third, when Avery was attacked by Paz on July 27, 2004. Defendants contend these were spontaneous events which were unanticipated by either the plaintiff or the defendants.

Defendants maintain that plaintiff's complaints that he was either housed in close proximity or allowed to be in the same area with an inmate who had attacked him are of little importance as Avery was never again attacked by the same inmate. Furthermore, defendants maintain there is nothing to establish the attack by Walters was related in anyway to the first altercation or the threats made by Smith. Similarly, defendants maintain there is no evidence that Paz was motivated by the first altercation or by Smith to attack Avery or that the deputies were aware of any potential risk to the plaintiff from Paz.

Quite simply, they argue there is no evidence they ever consciously disregarded an excessive risk to Avery. Instead, they state when they were made aware of any potential risk to Avery, they kept him separate from any inmate who appeared to pose a risk.

At most, defendants state plaintiff has stated a claim of negligence on their part. As negligence is not actionable under § 1983, defendants contend they are entitled to judgment in their favor.

-13-

Defendants also maintain there is no proof of an unconstitutional county custom or policy. As there is no vicarious liability under § 1983, defendants maintain Sheriff Keith Ferguson, Captain Hunter Petray, and Lt. Gene Hendricks cannot be held liable.

Finally, defendants argue the plaintiff's claim fails because he suffered no physical injury within the meaning of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(e). Defendants maintain plaintiff suffered at most *de minimis* injuries that are insufficient to satisfy § 1997e(e).

Avery was a pretrial detainee until July 19, 2004. *Resp.* at ¶ 91. Due process 'protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted.'" *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988). Similarly, the Eighth Amendment imposes a duty on the part of prison officials to protect convicted prisoners from violence at the hands of other prisoners. *Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998). In addressing failure to protect claims brought by pretrial detainees, the Eighth Circuit has noted that the pretrial detainees are entitled to at least as much protection as a convicted inmate and has applied Eighth Amendment analysis to claims brought both by pretrial detainees and convicted prisoners. *Perkins*, 161 F.3d at 1129- 1130. *See also Thomas v. Booker*, 784 F.2d 299 (8th Cir. 1986)(analyzing a pretrial detainee's failure to protect claim under the same Eighth Amendment analysis used for similar claims brought by prisoners.).

In *Riley v. Olk-Long*, 282 F.3d 592 (8th Cir. 2002), the court stated:

An Eighth Amendment claim for failure to protect is comprised of two elements. First, an "inmate must show that [he] is incarcerated under conditions posing a

-14-

substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the inmate must establish that the defendant prison official recklessly disregarded that risk. *Jackson v. Everett,* 140 F.3d 1149, 1151 (8th Cir. 1998). "For the purposes of failure to protect claims, it does not matter ... whether a prisoner faces an excessive risk of attack for reasons personal to [him] or because all prisoners in [his] situation face such a risk." *Hott v. Hennepin County, Minn.,* 260 F.3d 901, 906 (8th Cir. 2001) (internal quotations omitted). The question is whether a prison official has a "sufficiently culpable state of mind," meaning that [he] is deliberately indifferent to an inmate's safety. *Farmer,* 511 U.S. at 834 (internal quotation omitted). The prison official's state of mind is measured by a subjective, rather than an objective, standard. *Id.* at 838-39; *see also Jackson,* 140 F.3d at 1152 ("[D]eliberate indifference must be viewed from [defendants'] perspective at the time in question, not with hindsight's perfect vision."). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he] must also draw the inference." *Farmer,* 511 U.S. at 837.

*Riley,* 282 F.3d at 595. *See also Krein v. Norris*, 309 F.3d 487 (8th Cir. 2002)

Thus, to prevail, Avery must show: (1) that his incarceration with Smith, Walters, and Paz posed a substantial risk of serious harm, and (2) each of the defendants knew of and disregarded an excessive risk to Avery's safety. *Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003).

To establish the second component, Avery must show that each defendant acted, or failed to act, with deliberate indifference to Avery's safety. *Id.* Negligence is not sufficient. *Id.* Even if the conduct was unreasonable, this is not enough because "reasonableness is a negligence standard." *Id.* at 742 (internal quotation marks and citation omitted). Further, the Eighth Circuit has noted that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Id.* at 740-741 (internal quotation marks and citation omitted).

-15-

In *Perkins v. Grimes*, 161 F.3d 1127 (8th Cir. 1998), the district court "agreed that defendants were on notice that Wilson was a disruptive inmate," but found defendants "had no notice that Wilson posed a threat of serious injury to Perkins because Perkins did not effectively alert them that he faced such a threat." *Id.* at 1130. Further, the district court found that "the defendants periodic cell checks yielded no information that would have put them on such notice." *Id.* The Eighth Circuit found no clear error. *Id.* It noted that "[a]lthough the testimony indicated that Wilson was an easily provoked detainee, the evidence also shows that Perkins and Wilson had previously been housed together without incident and that Perkins' jailers neither knew, or had reason to know, that Wilson was a violent sexual aggressor, either on this or on a previous occasion." *Id.*

In this case, we believe genuine issues of fact preclude summary judgment in defendants' favor. With respect to the fight Avery had with Smith on May 1, 2004, Smith had made no threats towards Avery prior to this date and there had been no problems between the two of them. *Resp.* at ¶ 4. Avery was himself given a discplinary as a result of the incident and found guilty of fighting. *Resp.* at ¶ 7. No evidence suggests Smith had a known propensity for attacking fellow inmates or that defendants were somehow on notice that Smith posed a substantial risk of harm to Avery or other inmates. If this were the only incident involved, the court would have little trouble finding defendants entitled to summary judgment. However, it is not. Instead, this is merely the first of a series of incidents.

-16-

The next incident occurred on May 21, 2004, when Avery was bitten by Joseph Walters. Avery was seen by the nurse, who noted the wound was non-draining. *Resp.* at ¶ 13. Avery was given a tetanus shot. *Id.*

According to Avery, this incident occurred the day after he gave evidence to defendants regarding Smith that led to his re-arrest. *Resp.* at ¶ 17 & 20. Prior to May 21st, Avery had not had any problems with Walters. *Resp.* at ¶ 17. Avery was asked to explain how one or more of the defendants would have anticipated, or known, that he was in danger on May 21st. *Id.* Avery responded:

> Lt. Hendricks. Sgt. Clifford, Sgt. Daugherty had all questioned me about Smith on 5-20-04. I gave information about Smith to them & then after Smith was re-arrested due to the information I provided he was put in the same housing unit as me. The defendants had a duty to protect me especially after I gave them information that helped them to re-arrest a man who was facing a murder charge & released by negligence by jail staff & unknown until I came forward.

*Id.*

Avery maintains he was seen by a trustee, Brooks, while being escorted to the captain's office to be questioned about Smith. *Resp.* at ¶ 22. Avery contends defendants should have prevented his being seen and not have him returned to D-130. *Id.* Prior to the attack, Avery states Smith, Wolfe, and Walters all said that Brooks had told them about Avery being escorted to the captain's office. *Id.* at ¶ 23. Avery states he was then called a snitch and attacked by Walters. *Id.*

Avery does not contend one or more of the defendants started the rumor that he was a snitch. *Resp.* at ¶ 24. Nor does he indicate the defendants were aware of the fact that he had been seen by a trustee or were aware of the existence of the rumor. Avery does not contend that

AO72A
(Rev. 8/82)

he reported the rumor prior to the attack. *Id.* Rather, he merely asserts: (1) he was seen by a trustee; and (2) after Smith was re-arrested, due to information provided by Avery, Smith was put in the same housing unit Avery was in. If Avery could only point to this incident and the May 1st incident, the court would no doubt find the evidence insufficient to have put the defendants on notice that Walters or Smith posed a substantial risk of serious harm to Avery and other inmates.

At this point, there is nothing other than Avery's bare assertion to suggest Smith was aware of that fact that his re-arrest was based on information provided by Avery or any other detainee at the BCDC for that matter. Avery alleges nothing other than the fact that the trustee told other inmates including Walters, Smith, and Wolfe, that Avery had been in the captain's office. *Resp.* at ¶ 27. There could have been any number of reasons Avery was in the captain's office other than providing information regarding Smith.

However, the next incident occurred on June 24, 2004, just days after Avery had been served by Lt. Hendricks with a subpoena to testify against Smith. *Id.* at ¶ 42 & ¶ 43. On June 24th, Smith was placed in the same pod, E-104, with Avery. *Resp.* at ¶ 30. On June 25th, Avery states Smith was allowed into the day-room at the same time Avery was in the day-room. *Id.* at ¶ 37.

Smith made verbal threats to kill Avery but did not physically harm him. *Resp.* at ¶ 41. It is not clear exactly how long the two were in the same pod; however, Smith was moved to a different pod at some point on June 25th. *Id.* at ¶ 45.

At this point, the following had occurred: (1) Avery had been involved in a physical altercation with Smith; (2) Smith had been re-arrested using, in part, information provided by

AO72A
(Rev. 8/82)

Avery; (3) a trustee had seen Avery going into the captain's office and had reportedly told other detainees that Avery was a snitch; (4) Avery was bitten by Walters; (5) Avery reported the rumor had gotten around the jail that he was a snitch and had helped in Smith's return to jail, *defts. ex.* 3 at p. 22; and (6) Avery had been subpeonaed to testify against Smith. If defendants were not aware of each of these incidents as they occurred, they were certainly aware of the incidents by June 24, 2004.

On July 12, 2004, Avery contends both he and Smith were called out for a shave at the same time. *Resp.* at ¶ 46. Smith threatened to kill Avery if he testified but Smith did not physically harm Avery. *Id.* at ¶ 47. None of the named defendants were present when this incident occurred. *Id.* at ¶ 48. When Avery informed the officers present that he was not to be in the same area as Smith, Avery was told to lock back down. *Id.* at ¶ 47.

Finally, on July 27, 2004, Avery was involved in a fight with inmate Yoecer Paz in D-153. *Resp.* at ¶ 49. The fight was broken up by Deputy Rahn and Deputy Hubbs. *Id.* at ¶ 50. As Avery was being escorted from the pod he got into a verbal altercation with Smith. *Id.* at ¶ 53. Avery believes Paz attacked him because he was being labeled a snitch. *Id.* at ¶ 71.

As a result of the fight, Avery suffered a busted lip, swollen and bleeding gums, numerous bruises, extreme pain, and loose teeth. *Resp.* at ¶ 73. He sought medical treatment and was in pain for over a week. *Id.*

Prior to the incident on July 27th, Avery had not experienced any problems with Paz. *Resp.* at ¶ 74. He had not reported to any of the defendants that he believed he was in danger from Paz. *Id.* at ¶ 75. Paz was charged as a result of the incident. *Id.* at ¶ 77.

-19-

Avery maintains detention center staff allowed Paz to travel from E-102 to D-153 in order to attack Avery. *Resp.* at ¶ 83 & ¶ 84. Avery maintains defendants had prior knowledge of Paz's violent tendencies because he had been involved in two previous fights with other inmates. *Supp. Resp.* at p. 3.

Given the totality of the circumstances, we believe there are genuine issues of material fact as to whether Avery was incarcerated under conditions posing a substantial risk of serious harm and as to whether defendants recklessly disregarded the risk. Avery maintains, and we believe there are genuine issues of fact, as to whether the series of events are connected to his having given information to the defendants on May 20, 2004. Certainly, when the series of events are considered together, as opposed to being considered as isolated events as defendants suggest, it appears there may have been reason to believe Avery was in substantial risk of serious harm. Twice after Avery gave information to the defendants about Smith and had been subpoenaed to testify against him, Smith was allowed to come into close proximity to Avery. While Smith did not himself physically harm Avery, he did threaten to kill Avery. Avery had also reported that he was being called a snitch and that the other detainees knew he had given information that assisted defendants in re-arresting Smith.

With respect to Sheriff Ferguson, Captain Petray, and Lt. Hendricks, while defendants are correct in stating they cannot be held vicariously liable for the acts of those they supervise, we believe the plaintiff has pointed to specific actions or inactions of each of these defendants to form a basis of liability under § 1983. Among other things, Lt. Hendricks was present on May 20th, served the subpoena on Avery, and was present when Smith was moved into E-104 with Avery on June 24th. *See e.g., Resp.* at ¶ 20(A), ¶ 37 & ¶ 43. Captain Petray received and

-20-

responded to a number of grievances from Avery in which he stated he had been seen going into the captain's office by a trustee, indicated he was being called a snitch, and stated he believed his life was in danger. Petray was also aware of the incident involving Walters and Paz as well as the instances when Smith was allowed to come into close contact with Avery. Finally, with respect to Sheriff Ferguson, Avery maintains he personally spoke with Sheriff Ferguson about the dangerous situation. *Supp. Resp.* at p. 2.

Finally, we believe Avery suffered physical injury as a result of the bite by Walters and the attack by Paz. These injuries are sufficient to satisfy the physical injury requirement of the PLRA.

## IV. CONCLUSION

I therefore recommend that defendants' motion for summary judgment be denied.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 15th day of September 2005.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)